**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| NOAH LEASK and APC DATA ANALYTICS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 2:21-cv-2367-DCN |
| GREG ROBERTSON, *individually and d/b/a* VENDOR ALLEY, and WOOLLEY ROBERTSON GROUP INC. d/b/a W+R STUDIOS d/b/a CLOUD CMA d/b/a VENDOR ALLEY, | ) ) ) ) ) ) | **ORDER** |
| Defendants. | ) ) ) | |

The following matter is before the court on defendants' motion to dismiss, ECF No. 26.  For the reasons set forth below, the court grants in part and denies in part the motion.

## I.  BACKGROUND

This defamation action arises out of a series of internet posts from the owner of a blog site.  Defendant Greg Robertson ("Robertson") owns and manages a public blog site, vendoralley.com ("Vendor Alley").  The blog is named "Vendor Alley – Where Real Estate Gets Its Dirt."  Vendor Alley allegedly "posts 'dirt,' or gossip, about the real estate industry" and "effectively serv[es] the purpose of a real estate industry tabloid."  ECF No. 22, Amend. Compl. ¶¶ 7, 23.

Plaintiff APC Data Analytics, LLC ("APC") is a software development company that develops software tools for the real estate industry.  Plaintiff Noah Leask ("Leask," together with APC, "plaintiffs") is one of the founders and owners of APC.

1

In addition to operating the blog, Robertson is also the co-founder of defendant Woolley Robertson Group Inc. d/b/a W+R Studios d/b/a Cloud CMA d/b/a Vendor Alley ("W+R Studios") (together with Robertson, "defendants"). W+R Studios provides "data analytic services regarding the sale of real property in South Carolina," making it a direct competitor of APC. Amend. Compl. ¶ 32. Against this backdrop, the complaint alleges five defamatory blog posts were published by defendants. Those posts are discussed below.

### A. Blog Post One

On May 6, 2020, defendants published on Vendor Alley a post titled "Message to Noah T. Leask, CEO of APC Data Analytics" (the "May 6 post"). In the post, defendants included screenshots of private LinkedIn messages that Leask had sent to various owners and officers of W+M, although the screenshots purportedly excluded other parts of the messages that would have provided key context. Plaintiffs further allege the post stated that Leask "criminally harassed, intimidated, bullied, physically threatened, and/or attacked[] multiple 'female employees' [of W+M]." Amend. Compl. ¶ 44. The amended complaint does not specify the exact language used by defendants in the blog post nor does it include the post as an attachment. However, defendants attach each of the blog posts as exhibits.[1] The May 6 post begins with a screenshotted LinkedIn post by Leask wherein he states, in part: "Looks a lot like APC Residential Pricing & Analytics Tool since late 2016. This is a cheap poorly integrated knock off APC Data Analytics, LLC

---

[1] As the court will more thoroughly discuss, the court may take judicial notice of the blog posts even though they did not appear on the face of the complaint. Moreover, even if the court were not to consider the specific content of the blog posts, the court would reach the same result.

#innovations placed over the same thing you had for 10 years now.  W+R Studios,

marketing firm, let's see if you can keep it up."  ECF No. 26-2, Underwood Decl. at 7.

Following the screenshot, Robertson wrote, in relevant part:

> But that's not why I'm writing this letter.  Because as the owner of a
> company I can take criticism.  I'm a big boy.  I'm in the arena.  But what
> you have done is quite something different.  You are harassing and making
> personal attacks on my employees directly.  Below are screenshots of the
> LinkedIn messages you sent to them . . . . [Screenshot omitted]
>
> I'm not sure if you are aware of this but the father of the person you sent
> this message to recently died of cancer.  His mother was also recently
> diagnosed.  Also, what's up with the fist and "We will see you soon!"?  Is
> that a threat?  I'm going to assume you are not such a terrible person but
> just another dumbshit with a keyboard.
>
> Your next masterpiece is a doozy.  You sent it to a female employee of
> mine.  She doesn't need my help, she's been handling stupid men like you
> her entire career.  But I feel if I don't tell you this isn't appropriate then who
> will?  [Screenshot omitted]
>
> First off, she has no idea who you are. Now again, I am going to assume
> you are not another "macho man" thinking that you can bully women just
> by sending them an intimidating message. I'm going to assume again, you
> had a dumbshit moment with a keyboard.
>
> . . . .
>
> So, instead of posting pictures of gangsters, fists, making personal attacks
> on my employees and trying to intimidate my female employees, if you got
> a beef with me then be a man and pick up the phone.

ECF No. 26-2, Underwood Decl. at 8–10.  In the comment section of the blog post,

Robertson later wrote:

> @Jamie Lee Derrickson It boggles my mind that you would classify sending
> intimidating messages to a female staff member be the result of someone
> who is "full of passion." If you, Noah, or anyone else contacts her, or
> anyone else from my company again I have the number of the Mount
> Pleasant, SC Police station, 843- 884-4176 and will report you.

Id. at 13 (referenced at Amend. Compl. ¶ 46).

3

### B.  Blog Post Two

On May 8, 2020, defendants published another blog post, titled "Thank you" (the "May 8 post").  In the post, Robertson wrote: "I just wanted to end the week and thank everyone <u>for their support</u>.  It was the biggest single day of traffic in Vendor Alley history."  Underwood Decl. at 21.  The May 8 post included a hyperlink back to the May 6 post embedded in the words "for their support."

### C.  Blog Post Three

On May 12, 2020, defendants published a blog post titled "Noah T Leask of APC Data Analytics is still sending me threatening messages" (the "'Threatening Messages' post").  The post begins with a screenshot of what appears to be an email with a LinkedIn private message from Leask within it.  The private message included three emoticons, including a fist, and the words, "See you at the next event!"  Underwood Decl. at 27.

Under the screenshot, Robertson wrote, in relevant part:

> <u>One week later</u>.  No phone call. No apologies for sending my employees threatening messages.  No mea culpa for trying to intimidate my female employees.  Instead, Noah T. Leask, the creepy CEO of APC Data Analytics decides to send me an emoji of a fist and the message "See you at the next event!"
>
> What is wrong with this guy?  Does he want to fight me?  Are you still in 5th grade?  The industry was very clear on how they felt about your behavior and now you are going to "double-down"?
>
> And to anyone working at APC Data Analytics, none of whom I've ever met.  You may have a great product or produce crappy software, I have no idea.  How is it you condone this behavior?  Your silence speaks volumes.

Underwood Decl. at 28.  The underlined text above was a link back to the May 6 post.

Robertson also left a comment in the comment section below the post: "@Jennifer.  Yeah, I hadn't really thought of that scenario.  It might make the most sense.  Or maybe a drug problem?  That would be pretty sad.  Still perplexed on why no

formal communication from anyone at his company." Underwood Decl. at 29. The complaint further discusses comments by non-parties to this action "questioning whether Leask has a brain injury," Amend. Compl. ¶ 54, but the comment left by Robertson was the only one made by defendants.

### D. Blog Post Four

On the same day, May 12, 2020, defendants published another blog post. This post was titled "Noah T Leask appears to have been fired as CEO of APC Data Analytics for his inappropriate behavior" (the "'Fired' post"). The post begins with a snippet from APC's press release announcing that co-founder and chief innovation officer Anton Roeger IV would be taking over as president and CEO. Robertson then wrote:

> Another odd thing is that Noah T Leask's LinkedIn profile has completely disappeared. I'm not sure if this is due to my and other reporting of his inappropriate behavior to LinkedIn or part of a larger PR strategy from APC Data Analytics, LLC. [Update: This may be due to the fact I blocked him]
>
> It's good to know that LinkedIn doesn't find Noah T Leask's behavior of sending inappropriate and threatening messages acceptable.
>
> <u>When I first wrote about Noah T Leask sending intimating emails to a female employee</u> at my company, Jamie Lee Derrickson and Anton Roeger IV defended Noah T Leask by saying "He is an incredibly talented and intelligent man, and obviously full of passion!"

Underwood Decl. at 33–34. The underlined text was a link to the May 6 post.

### E. Blog Post Five

On May 14, 2020, defendants published a blog post entitled "Based on a true story…" (the "May 14 post"). In the post, Robertson wrote "UNHINGED" and then embedded a YouTube trailer for a movie called "Unhinged," starring Russell Crowe ("Crowe"). Below the trailer, Robertson wrote, "The guy in the truck reminds me of someone. I just can't put my finger on who it is though . . ."

5

According to the complaint, "Unhinged" depicts a man, played by Crowe, who engages in various "criminal activities," including assault and attempted vehicular homicide; breaking and entering; domestic abuse; arson; theft, stalking, and reckless driving; assault and battery; murder; and "[b]eing mentally unstable and psychotic." Amend. Compl. ¶¶ 63–64. The complaint alleges that defendants attempt to "draw a physical resemblance" between Leask and Crowe's character, both who have beards, and alleges that a reader would reasonably draw the conclusion that "Crowe[] is based on Leask, stemming from Leask's alleged criminal conduct[] and mental instability." Id. ¶ 64. Plaintiffs allege that defendants' actions caused damage to plaintiffs' reputation and mental wellbeing, as well special damages—including lost income and contractual relationships.

On July 30, 2021, plaintiffs filed this action against defendants, asserting claims for (1) defamation, (2) negligence/negligent supervision and training, (3) permanent injunction, and (4) intentional infliction of emotional distress. ECF No. 1, Compl. On November 2, 2021, defendants filed a motion to dismiss. ECF No. 14. On November 16, 2021, plaintiffs filed an amended complaint. Amend. Compl. The amended complaint retained the same causes of action but asserted additional facts.

On December 10, 2021, defendants filed a motion to dismiss the amended complaint.[2] ECF No. 26. On January 17, 2022, plaintiffs filed their response. ECF No.

---

[2] Defendants note that the amended complaint was filed more than twenty-one days after their answer, meaning that plaintiffs were required to seek leave to amend the complaint. In any event, defendants preemptively filed this amended motion to dismiss. Since "[t]he court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), the court permits the amendment and will therefore consider the original complaint and motion to dismiss to be mooted.

28. Defendants did not file a reply, and the time to do so has now expired. The court held a telephonic hearing on the motion on January 31, 2022. ECF No. 29. As such, the motion has been fully briefed and is now ripe for the court's review.

## II. STANDARD

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir.1999); Mylan Labs., Inc., 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III.   DISCUSSION

Plaintiffs raise four causes of action in their complaint: (1) defamation, (2) negligence and negligent supervision and training, (3) request for a permanent injunction, and (4) intentional infliction of emotional distress.  Defendant moves to dismiss all causes of action for failure to state a claim.  The court addresses each in turn, finding that plaintiffs have (1) plausibly alleged that certain statements were defamatory, (2) plausibly alleged negligent supervision and training by W+M, but not negligence by Robertson, (3) failed to clearly show that a permanent injunction is appropriate and necessary, and (4) plausibly alleged a claim for intentional infliction of emotional distress.

#### A.  Defamation

In resolving the instant motion to dismiss, the court must consider whether plaintiffs have sufficiently alleged facts upon which they could sustain a successful defamation action.  This analysis requires balancing principles from both South Carolina common law and the United States Constitution.  Indeed, in many respects, the issues boil down to one, as South Carolina courts have shaped South Carolina's common law to accord with the Supreme Court's jurisprudence.  See Erickson v. Jones Street Publishers, LLC, 629 S.E.2d 653, 665 (S.C. 2006) ("Concepts of common law defamation have been significantly modified since the 1960s by the First Amendment jurisprudence of the United States Supreme Court.").  For example, South Carolina courts recognize as part of South Carolina defamation law that "there is no constitutional value in false statements of fact."  Id. (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974)).  Therefore, the court addresses issues related to the First Amendment and issues arising under South Carolina's common law in turn.

8

As a preliminary matter, the court must determine whether it may consider the full content of the blog posts even though screenshots are not included within the four corners of the complaint.  To be sure, judicial notice should not "be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters."  Waugh Chapel S., LLC v. United Food & Com. Workers Union Local 27, 728 F.3d 354, 360 (4th Cir. 2013) (internal quotation marks and citation omitted).  However, it is equally well established that in considering a Rule 12(b)(6) motion, courts may consider "documents incorporated into the complaint by reference . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic."  United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014) (first quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); and then quoting Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)).  The blog posts are explicitly referenced in the complaint, and it is difficult to imagine documents more "incorporated" and "integral" to plaintiffs' complaint than the very blog posts that they allege are defamatory.  Defendants also certify via sworn declaration that the blog posts are authentic, and plaintiffs do not dispute their authenticity.[3]  Underwood Decl. at 3 et seq.  As such, the court will consider the full blog posts as reflected in defendants' exhibits to their motion to dismiss.

---

[3] Additionally, all five blog posts remain available at vendoralley.com.  They appear to be properly reproduced in defendants' exhibits.  Cf. Fauconier v. Clarke, 652 F. App'x 217, 219 n.4 (4th Cir. 2016) (taking judicial notice of government documents that were referenced in the complaint and were publicly accessible online).

### 1. First Amendment Limitations

"The 'application of the state law of defamation' is limited . . . by the First Amendment to the Constitution of the United States." <u>CACI Premier Tech., Inc. v. Rhodes</u>, 536 F.3d 280, 293 (4th Cir. 2008) (quoting <u>Milkovich v. Lorain J. Co.</u>, 497 U.S. 1, 20 (1990)). As an initial consideration, there are "two forces that . . . reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern." <u>Phila. Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 775 (1986). The Fourth Circuit has also indicated that additional limitations apply to "the protection for statements that cannot reasonably be interpreted as stating actual facts about an individual." <u>See</u> <u>CACI Premier</u>, 536 F.3d at 293. The parties advance arguments under each of these grounds, and the court will consider each one in turn.

### a. Public-versus-Private Figure

Speech concerning public figures is subject to increased scrutiny under the First Amendment as such figures "have greater access to the channels of effective communication" and, because they "have generally chosen to enter the public arena, they have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" <u>Hatfill v. The N.Y. Times Co. ("Hatfill I")</u>, 532 F.3d 312, 317 (4th Cir. 2008), <u>cert. denied</u>, 555 U.S. 1085 (2008). A plaintiff who is a public figure "must prove by clear and convincing evidence that the defendant acted with actual malice in publishing a false and defamatory statement about the plaintiff." <u>Erickson</u>, 629 S.E.2d at 665 (citing <u>N.Y. Times v. Sullivan</u>, 376 U.S. 254, 279–80 (1964)) (other citations omitted); <u>see also</u> <u>MVP Grp. Int'l Inc. v. Lancaster Colony Corp.</u>, 2013 WL 967787, at *1 (D.S.C. Mar. 12, 2013) ("Public figures must show that the defendant acted with

constitutional actual malice.").  A false statement is made with constitutional "actual

malice" when it is made "with knowledge that it was false or with reckless disregard of

whether it was false or not."  <u>N.Y. Times</u>, 376 U.S. at 280.  "Actual malice under the

<u>New York Times</u> standard should not be confused with the concept of [common law]

malice as an evil intent or a motive arising from spite or ill will."  <u>Masson v. New Yorker</u>

<u>Magazine, Inc.</u>, 501 U.S. 496, 510 (1991).

Defendants argue in their motion to dismiss that plaintiffs have failed to plead

actual malice but only briefly argue that Leask is a public figure.  Viewing the complaint

in the light most favorable to plaintiffs, plaintiffs have plausibly alleged that Leask and

APC were not public figures.

A general-purpose public figure is an individual who has achieved "such

pervasive fame or notoriety that he becomes a public figure for all purposes and in all

contexts."  <u>Gertz</u>, 418 U.S. at 351.  The Supreme Court has held that "only a small group

of individuals . . . are public figures for all purposes," <u>Wolston v. Reader's Digest Ass'n,</u>

<u>Inc.</u>, 443 U.S. 157, 164 (1979), and "[a]bsent clear evidence of general fame or notoriety

in the community, and pervasive involvement in the affairs of society, an individual

should not be deemed a public personality for all aspects of his life," <u>Gertz</u>, 418 U.S. at

351–52.

To attempt to prove that Leask was a general-purpose public figure, defendants

argue that Leask is "fairly prominent in the real estate industry based on the amount of

news coverage he has received over recent years."  ECF No. 26-1 at 14.  Defendants also

refer to his "prominen[ce] in the Charleston business community and "considerable

attention for his business and philanthropic pursuits."  <u>Id.</u> at 3.  The complaint itself does

not mention Leask's prominence in either the Charleston or real estate spheres other than to state that APC serves real estate companies.  Consequently, defendants argue that the court should take judicial notice of the "existence of articles," but not necessarily their factual content, to recognize that Leask has been the subject of press interest.  Id. at 3 n.1.  The court declines to take judicial notice of the articles.  In resolving a motion to dismiss, the court is constrained to only consider facts alleged in the complaint or contained within the documents attached to the complaint or referenced therein.  The articles fall under neither category.  Moreover, even if the court took notice of the articles, they constitute evidence on Leask's status as public figure that cannot be weighed at this early stage of the litigation, before plaintiffs have had an opportunity to submit any evidence to the contrary.

Defendants also argue, in a footnote, that Leask and APC were limited-purpose public figures, only to then argue that "dismissal without prejudice is appropriate without reference to this issue."  ECF No. 26-1 at 33 n.12.  Although the court is reticent to give too much credence to what appears to a be a throwaway argument, the court briefly addresses the law on limited-purpose public figures as well, ultimately finding that plaintiffs are not such figures.  The Fourth Circuit has offered the following test to help courts determine whether a plaintiff is a limited-purpose public figure:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 668 (4th Cir. 1982).  Even in defendants' motion, however, there is no reference to how Leask voluntarily assumed a

role of special prominence.  At most, he engaged plaintiffs and their employees in a series of posts and messages on LinkedIn, but he was not a public figure in either a general or narrow context.

Ultimately, the question of whether Leask is a public figure need not be resolved at this stage.  The determination of whether a plaintiff is a public or private figure "is a matter of law which must be decided by the court, on a case by case basis."  Erickson, 629 S.E.2d at 666.  That does not mean, however, that the court must make the determination without the benefit of reviewing the parties' discovery.  Therefore, as this court previously noted in another defamation case, "[t]his is a question more appropriate for a summary judgment motion after discovery has been conducted.  McGlothlin v. Hennelly, 370 F. Supp. 3d 603, 617 (D.S.C. 2019).

### b.  Public-versus-Private Concern

The parties next extensively debate whether defendants' blog posts were on matters of public concern.  In cases involving issues of public controversy or concern, courts have held that there is no presumption that the defendant acted with common law malice or that the plaintiff suffered actual damages.  Erickson, 629 S.E.2d at 665 (citing Gertz, 418 U.S. at 346–50).  Instead, the plaintiff must plead and prove both elements. Id.  Unlike actual malice, common law malice requires proving that the defendant "was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference toward plaintiff's rights."  Floyd v. WBTW, 2007 WL 4458924, at *3 (D.S.C. Dec. 17, 2007) (quoting Jones v. Garner, 258 S.E.2d 909, 914 (1968)).

13

"Whether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record." <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 761 (1985).  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  <u>Snyder v. Phelps ("Snyder I")</u>, 562 U.S. 443, 453 (2011).  Even if the subject of the speech is a private figure, the message may still concern a matter of public concern.  <u>See, e.g.</u>, <u>Floyd</u>, 2007 WL 4458924, at *2 (determining the plaintiff was a private figure but that the subject matter of the statement was of public concern).

Plaintiffs argue that "speech cannot be considered of 'public concern'" if it only concerns a particular industry.  ECF No. 28 at 14 (citing <u>Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.</u>, 553 F. Supp. 2d 680 (N.D. Tex. 2008)).  Conversely, defendants argue that speech involving a matter of public concern need only touch on issues in which "a small slice of the public" might be interested.  ECF No. 26-1 at 13 (quoting <u>Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc.</u>, 804 F.3d 59, 65 (1st Cir. 2015)).  These propositions appear to be directly at odds, but the court finds that plaintiffs' case, <u>Super Future Equities</u>, is contravened by Fourth Circuit caselaw.  <u>Super Future Equities</u> discussed a Fifth Circuit case that held that even if the record proves a topic was of particular interest to certain industries—there, the railroad and construction industries—it was not necessarily a matter of interest to the general public.  553 F. Supp. 2d at 690 (citing <u>Snead v. Redland Aggregates Ltd.</u>, 998 F.2d 1325, 1330 (5th Cir. 1993)).  However, the Fourth Circuit has stated that "[i]n order to be treated as speech

14

involving a matter of public concern, the interested community need not be especially large nor the relevant concern of 'paramount importance or national scope.'" <u>Snyder v. Phelps ("Snyder II")</u>, 580 F.3d 206, 220 (4th Cir. 2009), <u>aff'd</u>, 562 U.S. 443 (2011) (quoting <u>Levinsky's, Inc. v. Wal–Mart Stores, Inc.</u>, 127 F.3d 122, 132 (1st Cir. 1997)). The court thus adopts the Fourth Circuit's approach and finds that topics sufficiently relevant to the real estate industry could, in theory, be considered matters of public concern.

But this determination does not mean that the blog posts indeed involved matters of public concern.  Plaintiffs argue that defendants' blog is a "self-promotional blog site," and its statements were directed at "self interest" rather than public concern.  ECF No. 28 at 15.  Defendants dispute plaintiffs' characterization of the back-and-forth as a "purely personal squabble," instead arguing that the blog posts were an attempt to "out Leask's behavior to the real estate industry" and "expos[e] Leask's questionable conduct and behavior toward business competitors."[4]  ECF No. 26-1 at 14.

On the one hand, the four corners of the complaint reveal that Vendor Alley was intended "to be consumed by the real estate industry as factual 'reporting,'" Amend. Compl. ¶ 5, and there is at least one reference to a statement that the individuals who left comments on defendants' blog "were a whos who of real estate," <u>id.</u> ¶ 67(b) (cleaned up). On the other hand, the complaint factually alleges that Vendor Alley's "sole purpose" is to promote defendants' business.  <u>Id.</u> ¶ 38.  Ultimately, the court does not find that the contents of the blog posts rise to matters of public concern.  While members of the real

_____

[4] The court returns to these contentions later, in the context of whether the general tenor of the blog posts suggested they constituted figurative and hyperbolic speech.

estate public may have certainly been interested in Leask's actions, it is not clear from the face of the complaint that the speech concerned an ongoing public controversy. Rather, the complaint is most plainly read as alleging that the blog posts constituted "speech solely in the individual interest of the speaker and its specific business audience." <u>See</u> <u>Dun & Bradstreet</u>, 472 U.S. at 762. However, like the court's determination on the public-versus-private figure distinction, this determination need not be final, as information from discovery could shed light on how far the blog reached. For purposes of this motion to dismiss, however, the court finds that, viewed in the light most favorable to plaintiffs, the blog posts alleged in the complaint do not involve a public figure or matter of public concern and therefore the complaint is not subject to dismissal for failure to allege common law malice and general damages.

### c.  Subjective Interpretation

Plaintiffs argue that since the statements were not on a matter of public concern, and plaintiffs were not public figures, defendants' speech is "afforded the minimum levels of First Amendment protection." ECF No. 28 at 12. In their prior brief responding to defendants' motion to dismiss the original complaint, plaintiffs also suggested that statements concerning private figures and private matters do not need to be provably false to be actionable.[5] It is certainly true that First Amendment protections for speech of purely private concern are "often less rigorous" than those afforded to speech concerning matters of public interest. <u>Snyder I</u>, 562 U.S. at 452. Plaintiffs' original argument likely

---

[5] It appears that plaintiffs have since withdrawn this argument. <u>See</u> ECF No. 28 at 25 (acknowledging district court case analyzing the issue in a non-public-concern context). Instead, plaintiffs now argue that if such statements are "susceptible of a libelous construction," the court should err on the side of inferring a defamatory meaning. <u>Id.</u> at 29 (quoting <u>Todd v. S. State Bank</u>, 2015 WL 6408121 (D.S.C. Oct. 22, 2015)).

stems from the fact that the Supreme Court, in one of the seminal cases concerning this doctrine, wrote that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least . . . where a media defendant is involved." Milkovich v. Lorain J. Co., 497 U.S. 1, 19–20 (1990). The Supreme Court, even in subsequent cases, has not directly weighed in on whether the limitation exclusively applies to statements made by media defendants or on matters of public concern. See Snyder II, 580 F.3d at 220 ("Neither the Supreme Court nor this Court has specifically addressed the question of whether the constitutional protections afforded to statements not provably false should apply with equal force to both media and nonmedia defendants."); Mink v. Knox, 613 F.3d 995, 1006 (10th Cir. 2010) ("[T]he Supreme Court has not yet squarely addressed whether fantasy, parody, rhetorical hyperbole, or imaginative expression is actionable in a case where a plaintiff is neither a public figure nor the speech on a matter of public concern . . . ."). However, the Fourth Circuit has clarified that these standards apply equally to cases involving statements made by private individuals as they do to cases involving media defendants. Snyder II, 580 F.3d at 220 (Any effort to justify a media/nonmedia distinction rests on unstable ground . . . . Thus, for our purposes, the status of the Defendants as media or nonmedia is immaterial."). And the Fourth Circuit has strongly suggested, albeit without directly holding, that the standards apply to speech on matters of both public concern and private concern. See Choi v. Kyu Chul Lee, 312 F. App'x 551, 553 (4th Cir. 2009) (describing, in no uncertain terms, First Amendment limitations for "statements [that] cannot reasonably be understood to convey a false representation of fact") (internal quotation marks and citation omitted). Courts in this district have thus determined that private-

person and private-matter speech must be provably false to be actionable under

defamation law.  "The First Amendment imposes limitations based on the subject of the

alleged defamation as well as the type of speech at issue."  Davis v. New Penn Fin., LLC,

2021 WL 3410790, at *17 (D.S.C. May 25, 2021) (citation omitted).

Therefore, even in light of the court's preliminary finding that the blog posts

plausibly concerned private matters for purposes of a motion to dismiss, the protections

described in Milkovich and its progeny apply here.  Specifically, the First Amendment

protects "statements that cannot reasonably be interpreted as stating actual facts about an

individual."  CACI, 536 F.3d at 293 (citing Milkovich, 497 U.S. at 20).  Accordingly, a

state law defamation claim is not actionable if the challenged statement was merely

"rhetorical hyperbole," or based on "loose, figurative, or hyperbolic language."

Milkovich, 497 U.S. at 17 (citation omitted).  The court may consider whether the

"general tenor" of such rhetorical speech, together with the specific language used,

"sufficiently negates any impression that the speaker is asserting actual facts."  Snyder,

580 F.3d at 220.  "Whether a statement can reasonably be interpreted as stating facts

about an individual—whether it is rhetorical hyperbole, for example—is a question of

law."  CACI, 536 F.3d at 293–94; see also Hatfill v. N.Y. Times Co. ("Hatfill II"), 416

F.3d 320, 330 (4th Cir. 2005) ("The question whether a statement is capable of having a

defamatory meaning is a question of law to be decided by the court.").

Defendants argue, along those lines, that the court may take into account the

"general tenor" of the blog posts to determine that they could not be interpreted as stating

actual facts.  ECF No. 26-1 at 23.  In doing so, defendants argue that "[a]ll of the

purportedly defamatory statements occurred on . . . a self-professed source of 'dirt' that

18

Plaintiffs refer to as a 'tabloid.'" Id. at 19.  Defendants argue, therefore, that "[w]hen reviewed in context, the Vendor Alley Blogposts are protected by the First Amendment as rhetorical hyperbole, subjective surmise or conjecture, opinions based on disclosed facts, or a combination thereof." Id.  The court rejects any wholesale attempt to claim that the entire series of blog posts constituted rhetorical hyperbole.  While attempting to argue that the blog posts were on matters of public concern to the real estate industry, defendants stated that the blog posts were meant to "out Leask's behavior to the real estate industry" and "expos[e] Leask's questionable conduct and behavior toward business competitors." Id. at 14.  Now, in this context, they argue the speech is "playground banter." Id. at 23.  Either the posts are purely farcical, or they are meant to expose the wrongful conduct of a member of the business community; defendants cannot have it both ways.

The court may ultimately find at a later stage of these proceedings that each statement may be understood as representing defendants' subjective views of Leask's LinkedIn messages.  Viewers of the post could arguably recognize "that the challenged statements constitute a subjective view, not a factual statement."  See Biospherics, Inc v. Forbes, Inc., 151 F.3d 180, 186 (4th Cir. 1998) ("When a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than [a] claim[] to be in possession of objectively verifiable facts, the statement is not actionable.'") (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993) (alterations in original).  But the complaint must be read in the light most favorable to plaintiffs, and as the court will discuss, plaintiffs have plausibly alleged that most of the statements, when read in conjunction with one another, may lead a reasonable reader to believe that

Leask criminally harassed W+R Studios employees.  The interpretive effect of an

allegedly defamatory statement is measured through the eyes of a "reasonable reader."

Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir. 1993); see Snyder II, 151

F.3d at 183 (observing that the court is "obliged to assess how an objective, reasonable

reader would understand a challenged statement") (citation omitted).  At this stage of the

proceedings, the complaint has plausibly alleged that the quantity, pointedness, and

specificity of the posts does not fully "negate[] any impression that the speaker is

asserting actual facts" such that they are nonactionable.  See Snyder II, 580 F.3d at 220.

### d.  Disclosed Facts

Relatedly, defendants argue that the statements in question are interpretive

opinions that are accompanied by the disclosure of their underlying facts.  The First

Amendment protects such opinions because when "the bases for the . . . conclusion are

fully disclosed, no reasonable reader would consider the term anything but the opinion of

the author drawn from the circumstances related."  Chapin, 993 F.2d at 1093; Moldea v.

N.Y. Times Co., 15 F.3d 1137, 1144–45 (D.C. Cir. 1994), modified, 22 F.3d 310 (D.C.

Cir. 1994) ("Because the reader understands that such supported opinions represent the

writer's interpretation of the facts presented, and because the reader is free to draw his or

her own conclusions based upon those facts, this type of statement is not actionable in

defamation."); Agora, Inc. v. Axxess, Inc., 90 F. Supp. 2d 697, 704 (D. Md. 2000) ("The

principle that opinions based on disclosed facts are protected is well established.").

Defendants included screenshots of LinkedIn messages purportedly from Leask

right before discussing those messages in the May 6 post.  Defendants even write in the

beginning of the May 6 post: "You are harassing and making personal attacks on my

20

employees directly.  Below are screenshots of the LinkedIn messages you sent to them."
Underwood Decl. at 8.  However, not all of defendants' statements are readily
attributable to a disclosed fact.  For example, Robertson accused Leask of "trying to
intimidate my female employees," which, in the light most favorable to plaintiffs, could
be understood as stating a fact that multiple harassing private messages were sent to
female employees—rather than just the one shown.  As such, the court cannot conclude at
this stage that a reasonable reader, when viewing the blog posts together, may have
believed that they were opinions based on disclosed facts.  Again, the court may
ultimately determine that the statements are interpretive opinions at the summary
judgment stage, but at this juncture, the court finds that in the light most favorable to
plaintiffs, the statements may plausibly be viewed as something more than the simple
disclosure of facts and defendants' accompanying thoughts.

### e.  Defamation by Implication

Finally, the principle that rhetorical speech is nonactionable is closely related to
the idea that statements may also be read beyond their literal meaning.  The complaint
alleges that "[t]hese defamatory publications, when read together and in context,
perpetuate a false narrative that Plaintiffs engage in a pattern of behavior that is
criminally harassing and intimidating to Defendants, and their employees."  Compl. ¶ 3.
Although plaintiffs, in arguing against the instant motion to dismiss, did not necessarily
pursue this theory of "defamation by implication" in great detail, the court finds that the
complaint sufficiently alleges such a theory.  See also id. ¶ 18 ("These false and libelous
publications, when taken in full context and read together, publicly convey the message
that Plaintiffs engaged in a pattern of criminally harassing behavior against multiple

21

women and employees of Defendant . . . .").  As such, the court considers the doctrine below.

Plaintiffs cite to a Fourth Circuit case, Chapin v. Knight-Ridder, Inc., 993 F.2d 1087 (4th Cir. 1993) for a two-part test that purportedly applies to claims of defamation by implication.  The court finds that Chapin is not necessarily instructive.  The Fourth Circuit in Chapin found that "a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true.  The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."  Chapin, 993 F.2d at 1093 (4th Cir. 1993) (citing White v. Fraternal Order of Police, 909 F.2d 512, 520 (D.C. Cir. 1990)) (emphasis added).  In other words, Chapin merely explained that if the alleged defamation "arises from substantially true facts," a plaintiff may argue that the collection of true statements was deployed in a way that suggested a false implication.  Chapin, 993 F.2d at 1092.  Indeed, the Fourth Circuit clarified in a separate case that "Chapin is inapposite" when a plaintiff alleges "both that the inference . . . is false and that the factual assertions from which that inference arises are false."  Hatfill II, 416 F.3d at 334 n.7.  Since plaintiffs ostensibly maintain that Leask did not, in fact, intimidate and harass defendants' employees, Chapin is indeed inapposite here.[6]

---

[6] As another basis for distinguishing Chapin, it is not readily apparent whether the court was applying Virginia law on libel-by-implication.  See Chapin, 993 F.2d at 1092 (citing Carwile v. Richmond Newspapers, Inc., 82 S.E.2d 588, 591–92 (Va. 1954); see also Lokhova v. Halper, 995 F.3d 134, 145–46 (4th Cir. 2021) (citing Virginia law for the proposition that "a plaintiff may state a defamation claim based on innuendo arising out of statements that are otherwise non-actionable on their face").

While <u>Chapin</u> may not be directly applicable, the court recognizes that South Carolina law similarly recognizes defamation by implication.  "Defamation may also be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference."  <u>Neloms v. Charleston Cnty. Sch. Dist.</u>, 2019 WL 6092279, at *13 (D.S.C. June 19, 2019) (internal quotations and citation omitted); <u>see also</u> <u>Todd</u>, 2015 WL 6408121, at *3 (recognizing defamation per quod).  In the context of the First Amendment, "whether the term is hyperbole or whether it implies facts turns not on the word itself but on the context in which it is used."  <u>Faltas v. State Newspaper</u>, 928 F. Supp. 637, 647 (D.S.C. 1996).  Therefore, the court will review whether the statements, when read together, may give rise to a plausible claim of defamation by implication. With these principles in mind, the court proceeds to analyze the statements at issue.

### i.  May 6 Post

Plaintiffs allege that the May 6 post "falsely libeled Plaintiffs by accusing Plaintiffs of criminally harassing, threatening, intimidating, attacking, and/or assaulting, employees of Defendants . . . . [and] feeding into the false narrative that Plaintiffs engage in a pattern of violent and intimidating activity, particularly against women."  Amend. Compl. ¶ 44.  As outlined above, the court must determine whether these statements— when read together—are verifiable statements of fact or if they contribute to plaintiffs' claim of defamation by implication.  While the court may later determine that the statements do not present any readily disprovable factual assertions, the court will not dismiss plaintiffs' defamation claim as it relates to this blog post because in the light most favorable to plaintiffs, the statements are contextually read as factual assertions that Leask's behavior was criminal in nature.  Even statements where defendants did not

directly refer to what Leask had purportedly done—for example, the comment in which Robertson stated he had the Mount Pleasant police station number and could report Leask—plausibly contribute to this suggestion.  In sum, the court finds that the claims related to the May 6 post survive the motion to dismiss stage.

### ii.  May 8 Post

The May 8 post merely thanked the readers of the blog and stated that Vendor Alley had received its biggest single day of traffic in its history.  Plaintiffs do not assert that there is any new defamatory language in the substance of the May 8 post.  Instead, they argue that defendants "republish[ed] defamatory language by providing a link to the May 6 post.  Amend. Compl. ¶ 47.  While it is true that "one who repeats a defamatory statement is as liable as the original defamer," defendants are the author of both the May 6 and May 8 republication.  Reuber v. Food Chem. News, Inc., 925 F.2d 703, 712 (4th Cir. 1991).  The court determined that plaintiffs have presented a prima facie case of defamation based on the May 6 post but finds that based on the complaint, this post does not contribute to plaintiffs' claim of defamation.

### iii.  "Threatening Messages" Post

Plaintiffs allege that the "Threatening Messages" post "falsely and defamatorily accused Plaintiffs of criminal assault and/or threatening physical assault, while also publishing that Plaintiffs are not fit for their occupation or business."  Id. ¶ 48.  For the same reasons as discussed earlier, the court finds that while the statements may ultimately be deemed rhetorical hyperbole or subjective opinions at the summary judgment stage, when viewed in the light most favorable to plaintiffs, the statements contribute to the

implication that Leask engaged in criminal harassment and should survive defendants'
motion to dismiss.

Under this blog post, plaintiffs further allege that a statement was made about
Leask that departed from claims about his behavior towards defendants' employees.
Specifically, the complaint alleges that defendants commented, falsely, that Leask had a
drug problem. Amend. Compl. ¶ 53. The statement in question reads: "@Jennifer.
Yeah, I hadn't really thought of that scenario. It might make the most sense. Or maybe a
drug problem? That would be pretty sad. Still perplexed on why no formal
communication from anyone at his company." The court agrees that if this statement had
affirmatively stated that Leask suffered from mental illness or a drug problem, it would
allege a provably false statement of fact. However, as it stands, Robertson only replied to
a comment asking if Leask suffers from "mental illness" or "brain injury"[7] by stating it
"<u>might</u> make the most sense." Robertson similarly questions whether "<u>maybe</u> [it is] a
drug problem?" The court finds that unlike the other statements discussed, even when
read in the light most favorable to plaintiffs, these are clearly statements of "theory,
conjecture or surmise." <u>Biospherics</u>, 151 F.3d at 186. Therefore, the court dismisses
plaintiffs' defamation claims to the extent any of those claims argue that statements
accusing Leask of having a drug problem are actionable.

### iv. "Fired" Post

The complaint alleges that the "Fired" post "was false and defamatory in that
Leask was not fired." Amend. Compl. ¶ 55. The court agrees that the complaint sets out

---

[7] This statement itself is not actionable, despite its inclusion in the complaint,
Amend. Compl. ¶ 54, because the speaker is not a named defendant.

a plausible claim stating that this blog post asserts provably false facts.  Read in the light most favorable to plaintiffs, a reasonable reader could interpret the title and the post as suggesting that Leask had been fired.   Moreover, the inclusion of a portion of APC's press release does not demonstrate, as defendants argue, that the "Fired" post was an opinion based on disclosed facts because, as plaintiffs observe, nothing in the press release indicated Leask had been fired.  In other words, it is not the case here that "no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances"; in order for defendants to have reached the conclusion that Leask was fired, they must have relied on other information or falsely stated that fact.  Chapin, 993 F.2d at 1093.  Additionally, the substance of the "Fired" post claims Leask's termination was based on supposedly "inappropriate behavior," Amend. Compl. ¶ 55, which again, contributes to the implication that Leask's behavior amounted to criminal harassment.  Accordingly, the defamation claims relating to statements that Leask was fired and that LinkedIn acted based on this information will be allowed to proceed.

### v.  May 14 Post

Finally, plaintiffs argue that defendants' statement "claiming the movie was 'based on a true story []' about Leask . . . . is demonstrably false" and therefore defamatory.  ECF No. 28 at 22.  The court is more skeptical of this claim—and plaintiffs' related arguments—compared to its prior claims.  Plaintiffs' statement is obviously false.  But no viewer would reasonably believe that defendants were seeking to imply that the movie was actually based on a true story of a road rage incident involving Leask.

Similarly, plaintiffs argue that the statement "[t]he guy in the truck reminds me of someone.  I just can't put my finger on who it is though . . ." is defamatory based on the

content of the movie trailer and meant to insinuate, in context, that Leask was "murderous, insane, and capable of violence." Id. at 25. The court disagrees. The statements comparing Leask to a fictitious character are clearly expressions of hyperbole, as plaintiffs acknowledge. The court further finds that the complaint fails to plausibly allege that any of the statements made by defendants went as far as suggesting Leask was "murderous." Id. at 25. Plaintiffs will be permitted to proceed with their defamation claim based on the notion that statements about Leask's allegedly harassing behavior are susceptible to a libelous construction, but those same claims will be barred to the extent they rely on the May 14 post, as even in the light most favorable to plaintiffs, there is no plausible allegation that defendants were accusing plaintiffs of any other crimes like those committed by Crowe's character.

Having addressed each of the blog posts through the lens of the First Amendment, the court next turns to South Carolina's common law.

### 2. South Carolina Common Law

Defamation claims can be brought for either libel or slander. Parrish v. Allison, 656 S.E.2d 382, 388 (S.C. Ct. App. 2007). "Libel is the publication of defamatory material by written or printed words," while slander is "spoken defamation." Id. To bring a successful claim for defamation, a plaintiff must prove: "(1) a false and defamatory statement was made; (2) the unprivileged publication of the statement was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement regardless of special harm or the publication of the statement caused special harm." Kunst v. Loree, 817 S.E.2d 295, 302 (S.C. Ct. App. 2018), reh'g denied (Aug. 16, 2018). The court considers each element of defamation below.

### a. False and Defamatory Statement

"Under common law, a defamatory communication was presumed to be false, but truth could be asserted as an affirmative defense." Parrish v. Allison, 656 S.E.2d 382, 391 (S.C. Ct. App. 2007) (citing Beckham v. Sun News, 344 S.E.2d 603, 604 (S.C. 1986)). If there is a dispute regarding the truth of the defamatory statement, it is a question for the jury to determine. Weir v. Citicorp Nat'l Servs., Inc., 435 S.E.2d 864, 867 (S.C. 1993).

Additionally, "[t]he publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Fleming v. Rose, 567 S.E.2d 857, 860 (S.C. 2002). "It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." Lane v. Hilton Worldwide, Inc., 2012 WL 1191648, at *3 (D.S.C. Feb. 28, 2012), report and recommendation adopted, 2012 WL 1192065 (D.S.C. Apr. 10, 2012) (internal quotation marks and citation omitted). "The Court will not hunt for a forced and strained construction to put on ordinary words, but will construe them fairly, according to their natural and reasonable import, in the plain and popular sense in which the average reader naturally understands them." Timmons v. News & Press, Inc., 103 S.E.2d 277, 280–81 (S.C. 1958). In other words, there is a presumption of falsity but "no presumption of defamation." Id. at 281.

As the court frequently alluded to in its First Amendment analysis, the actionable statements regarding Leask's alleged behavior of sending intimidating or threatening messages, when read together, plausibly tend to harm plaintiffs' reputations or lower them in the estimation of the community. Plaintiffs have sufficiently pleaded that the

statements indeed had such an effect.  The complaint alleges that the blog posts induced

comments from readers such as "I . . . severed my ties [to Plaintiffs] on LinkedIn" and

"As a result of this I will make sure he [Leask] and I don't cross paths."  Amend. Compl.

¶ 67 (alterations in original).  Similarly, statements about whether Leask was fired or

removed from a social media platform as a result of that behavior also serve as proper

bases for plaintiffs' South Carolina claims because the complaint plausibly alleges those

allegations harmed his reputation and deterred others from doing business with APC.

### b.  Unprivileged Publication to a Third Party

Each of the blog posts, including the "Fired" post, were published on the internet

and available to the public.  Therefore, the second element is satisfied.

### c.  Fault

The complaint alleges that the defamatory statements was made by defendants,

and therefore, it sufficiently alleges that defendants are at fault for publishing the

statement.

### d.  Actionability or Special Harm

Under the fourth element, a plaintiff must either prove that she suffered special

harm from the allegedly defamatory statement or demonstrate that the statement is

otherwise actionable.  Under the common law, "[l]ibel is actionable per se if it involves

written or printed words which tend to degrade a person, that is, to reduce his character or

reputation in the estimation of his friends or acquaintances, or the public, or to disgrace

him, or to render him odious, contemptible, or ridiculous."  Erickson, 629 S.E.2d at 664.

South Carolina courts have come to find that if the statement was written, it will

generally be considered actionable per se.  See Holtzscheiter v. Thomson Newspapers,

Inc., 506 S.E.2d 497, 502 (D.S.C. 1998) ("Essentially, all libel is actionable per se.").  If

a statement is actionable per se, common law malice and general damages are presumed.

Erickson, 629 S.E.2d at 664.  Therefore, the court finds that plaintiffs have sufficiently

alleged the final factor to state a claim for defamation under South Carolina law.

### B.  Negligence/Negligent Supervision and Training

The court next considers defendants' motion to dismiss plaintiffs' negligence and

negligent supervision claims.  "A claim that a statement constitutes libel or slander must

be brought in a defamation cause of action, which is grounded in and affected by both

common and constitutional law."  Erickson, 629 S.E.2d at 373–74.  To allow otherwise

would allow plaintiffs to sneak into the courthouse through the back door when they were

unable to plead the strict elements of defamation through the front door.  Id. (affirming

dismissal of the plaintiff's claim that the defendant was negligent in making a defamatory

statement).  The complaint alleges that "Robertson owed a common law duty not to use

or allow any website platform owned by him to publish false and defamatory

misrepresentations."  Amend Compl. ¶ 82.  This is plainly a defamation claim in sheep's

clothing.  The court thus dismisses plaintiffs' negligence cause of action against

Robertson.

Next, plaintiffs' claims that W+R Studios breached (1) a common law duty to

"institute proper policies, guidelines[,] and training" concerning the use of marketing and

public relations platforms—namely, Vendor Alley—and (2) a common law duty to

supervise Robertson.  See Amend. Compl. ¶¶ 80–81.  Defendants argue that the same

principle from above applies: namely, plaintiffs "may not bypass the strictures of the First

Amendment . . . by seeking publication damages for non-defamation tort claims."  ECF

No. 26-1 at 30 (quoting Allen v. Beirich, 2021 WL 2911736, at *4 (4th Cir. July 12, 2021)).  Specifically, defendants argue that plaintiffs are attempting to bypass the First Amendment by seeking reputational damages in their negligent training claim, even though such a claim is still "based on the content of Robertson's speech."  Id.  In Allen, the case cited by defendants, the plaintiff alleged that the defendants improperly obtained private documents and published a "hate map" that purported to depict the location of more than 900 active hate groups in the United States.  2021 WL 2911736, at *1–2.  The map included a caption claiming that the plaintiff was a neo-Nazi.  The plaintiff brought claims for defamation and other non-defamation tort claims, including a claim that the defendant's "failure to train and supervise its employees caused the employees to engage in the illegal receipt of the [] documents."  Id. at *4.  The Fourth Circuit affirmed the trial court's ruling dismissing the negligent training and supervision claim.  The trial court had determined—and the Fourth Circuit agreed—that the claim "ar[o]se from Allen's underlying allegation" that the defendants wrongfully published the article.  Id.  Yet the court had already rejected the underlying allegation that publication of the article was defamatory on First Amendment grounds.  Id.

Plaintiffs fail to respond on this issue.  Instead, they merely reiterate that the complaint sets out the prima facie case for negligent supervision and training, but they fail to discuss how the claim is not an attempt to circumvent First Amendment protections.  While Allen therefore appears, on face, to provide a roadmap for adopting a similar holding, the court finds that the case is distinguishable—at least for purposes of this motion to dismiss.  For one thing, Allen is an unpublished opinion and therefore not binding upon this court.  More importantly, while the Allen court's holding that non-

defamation torts are not shielded from First Amendment scrutiny is well-grounded in Supreme Court and Fourth Circuit precedent, defendants fail to mention that the court proceeded to analyze the tort claims under the First Amendment, recognizing that prior cases have nevertheless allowed non-defamation tort claims to proceed if they pass First Amendment muster.  See id. (citing Cohen v. Cowles Media Co., 501 U.S. 663 (1991)).  The Allen court ultimately determined that truth was a valid defense for a publication of public significance, which the hate map was.  Id. at *4.  Defendants fail to undergo a corresponding First Amendment analysis of plaintiffs' negligent hiring and training claim here.  The court previously found that plaintiffs had viable defamation claims that were permitted to proceed.  Thus, there are still statements that, for purposes of this motion to dismiss, are not subject to dismissal under the First Amendment and for which plaintiffs may plausibly argue W+R Studios negligently allowed to be published.  The notion that a non-defamation tort claim may not bypass the First Amendment does not spell automatic defeat of the claim because the allegedly tortious act may still be actionable under the First Amendment.  Accordingly, the claim for negligent supervision and training against W+R Studios will be allowed to proceed to the extent they relate to the statements that the court previously upheld as actionable.

### C.  Permanent Injunction

Plaintiffs, in their complaint, seek a permanent injunction, and defendants move to dismiss that cause of action.  The court need not determine the merits of a request for permanent injunctive relief on a motion to dismiss.  See Jinks v. Sea Pines Resort, LLC, 2021 WL 4711408, at *6 (Oct. 8, 2021) (noting the distinction between a claim for preliminary and permanent injunctive relief and declining to dismiss a claim for

permanent injunction).  As such, the court declines to dismiss plaintiffs' claim for injunctive relief but makes no determination on the merits of the claim at this time.

### D.  Intentional Infliction of Emotional Distress

Finally, defendants move to dismiss plaintiff's intentional infliction of emotional distress claim.  The analysis for that claim is similar to the one conducted on plaintiffs' negligent training and supervision claim.  In short, the Supreme Court has recognized that the First Amendment's limitations apply with equal force to "damages for emotional harm caused by the publication of [a statement] offensive to [the plaintiff]."  Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988).  This principle has been repeatedly upheld by the Fourth Circuit.  See, e.g., Snyder II, 580 F.3d at 218 ("Thus, regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech.").  As such, those courts proceeded to undertake a First Amendment analysis of the intentional infliction of emotional distress ("IIED") claims.  In Hustler Magazine, for example, the Court found that the plaintiff was a public figure, subject to "vehement, caustic, and sometimes unpleasantly sharp attacks," and thus, the First Amendment inured.  Hustler Magazine, 485 U.S. at 51 (internal quotations and citation omitted).  Here, defendants have shown no independent reason that the IIED claims trigger a different First Amendment analysis than what the court previously applied.  Therefore, at the motion to dismiss stage, the court finds that plaintiffs' IIED claims should be allowed to proceed as to the statements found to be sufficiently alleged as defamatory.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 7, 2022**
**Charleston, South Carolina**

34